**IN UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO.  RDB-25-162** |
| **JAMES ENRY,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by undersigned counsel, hereby files the following sentencing memorandum in support of a requested sentence of 27 months imprisonment. The Defendant committed two serious crimes, the first involved the paying of bribes to a Baltimore City employee to escape water bills, and the second involved the receipt of a fraudulent Payroll Protection Plan loan. A sentence of 27 months is sufficient but not greater than necessary to fulfill the requirements of 18 U.S.C. § 3553(a).

## I.    BACKGROUND

The facts of this case are laid out in the statement of facts to the Defendant's plea agreement. James Carroll Erny, age 53, is a resident of Glen Arm, Maryland.  At all relevant times, he owned least eight real estate properties in Baltimore City, Maryland, which owed various liabilities to Baltimore City, Maryland, including for property taxes and water service. Erny's co-conspirator Joseph Gillespie was a resident of Baltimore City and employed by the Department of Revenue Collection, Baltimore City and, in that role, acted as an agent of Baltimore City. Erny's other co-conspirator Ahmed ("Adam") Sary was also a resident of Baltimore City.

Beginning in December 2019 and continuing through in or about August 2023, Erny engaged in a bribery scheme with Gillespie where, in exchange for bribes Erny paid to Gillespie, Gillespie used his official position as an employee of Baltimore City to extinguish various financial

1

obligations owed to the City by Defendant in connection with the properties he owned, including for unpaid water and tax bills. Erny paid Gillespie at least $25,000 in bribes in connection with the scheme and caused losses to the City of at least $147,484.29.

Beginning in March 2021 and continuing through September 2021, Erny and Sary engaged in a separate scheme to defraud a financial institution, Cross River Bank, and the United States Small Business Administration ("SBA"), to obtain fraudulent loans for various purported businesses under the Paycheck Protection Program ("PPP"), which was part of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, and the Economic Injury Disaster Loan ("EIDL") program. Ultimately, Erny fraudulently obtained $996,240 in fraudulent PPP funds as part of the scheme, and $100,000 worth of EIDL funds too. However, none of those EIDLs ultimately closed.

### Bribery Scheme

At all relevant times, Gillespie was an employee within the Baltimore City Department of Finance, Revenue Collections Department, located within the Abel Wolman Municipal Building in downtown Baltimore City. Gillespie was hired by Baltimore City in or about June 2006 and served as an agent of Baltimore City—a City that in each calendar year from 2020 to 2023 received federal benefits in excess of $10,000.

Beginning in or about December 2019 at the latest and continuing until August 2023, Erny engaged in a bribery scheme with Gillespie in which Gillespie abused his position of trust as a public official for his own personal gain. During this period, Erny—who owned at least eight properties in Baltimore City—routinely paid bribes to Gillespie in exchange for Gillespie delaying, removing or extinguishing financial obligations owed to the City, including for unpaid citations, tax obligations, and water obligations—thereby causing losses to the City.

Erny primarily paid these bribes to Gillespie by cash—providing Gillespie envelopes containing as much as $1,000 each while Gillespie was working at the Abel Wolman Municipal Building. At times, Erny provided Gillespie envelopes containing cash bribes in a men's bathroom at the building. Erny also routinely provided Gillespie bribe payments via Cash App and Zelle—paying Gillespie least $9,253 for the time period of August 2021 to August 2023. Erny and Gillespie routinely communicated about the bribery scheme over Facetime and iMessage and using Signal, an encrypted messaging service.

For example, in September 2022, Defendant and Gillespie discussed over iMessage various properties owned by Erny that each had outstanding financial obligations due to Baltimore City. In response to an inquiry from Erny concerning three properties, Gillespie wrote the monies owed in connection with each property, "[Address 1] is $18,303.13[.] [Address 2]-$18,669.85[.] [Address 3]- $10,018.7." Erny wrote, "Can u pay about half on these ?  And i take care of the rest[.]  We can do 1 a week for the next couple weeks."

Referring to the size of the bribe he would pay Gillespie to remove the financial obligation, Erny responded, "20%?" or a bribe equaling 20% of the amount Erny owed on the various properties.  Thereafter, Erny and Gillespie continued to negotiate about what portion of the monies owed to Baltimore City, if any, would be paid by Erny, the size of the bribe Erny would provide to Gillespie and, eventually, the timing of their meeting.

For example, Erny and Gillespie had the following exchange on September 12, 2022 and September 13, 2022:

| | |
|---|---|
| **Erny:** | What's the lowest possible? |
| **Gillespie:** | 7 ? |
| **Erny:** | I thought I was hitting u w 25% |
| **Gillespie:** | How much u got for it man lol |
| **Erny:** | As much for you and as little for them as possible? |

| | |
|---|---|
| **Gillespie:** | 6k for city ?  That's cool on 18 bro |
| **Erny:** | f the city. and YES!  $6k even? |
| **Gillespie:** | Bout 6500 |
| . . . . | |
| **Erny:** | Cash or cashiers check? |
| **Gillespie:** | Cash |
| . . . . | |
| **Erny:** | Me and u today I'm good if your good. Inside or outside? |
| **Gillespie:** | Come get bill  Go to mens room After paid  Handshake hug done  Lol[.] |

On September 13, 2022, Defendant paid Gillespie a $2,500 bribe in exchange for Gillespie's removal of more than $11,659.80 in funds owed to the City.

Likewise, on February 2, 2023, Defendant once again offered Gillespie a bribe in exchange for removing financial obligations he owed Baltimore City in connection with multiple properties. Defendant had the following exchange with Gillespie:

| | |
|---|---|
| **Erny:** | Will 20% get you motivated?  [Address 1] ?  Or [Address 2] / [Address 3] / [Address 4] [Address 5] / [Address 6]  [Address 7] |
| **Gillespie:** | Ok bro[.]  Shit just slow[.] I ain't forget u[.] |
| **Erny:** | Hit them all if slow before this city gets its shit straight.  PLEASE[.]  Tax TOO? |
| **Gillespie:** | Yessir |
| **Erny:** | [Address 1] was supposed to have been done and I paid you for it I thought. No worries though it's grown bigger and I'll still pay you full amount you request. |
| **Gillespie:** | U ain't pay for me they one bro[.]  That[.]  It's going to get done[.] |
| **Erny:** | I don't care. |
| **Gillespie:** | Lol |
| **Erny:** | Truly. I'm happy to pay u instead of corrupt politicians[.] |

Likewise, on March 26, 2023, Erny, using iMessage, sent Gillespie photographs of City of Baltimore water bills associated with four properties he owned—one property had an amount due

4

of $30,652.22; one had an amount due of $7,721.43; one had an amount due of $5,049.87; and one had an amount due of $6,322.41. Erny wrote, "5 K to make them all go away"—referring to the outstanding balance Erny owed on each property. Gillespie responded, "Working on them[.] Don't need 5 K bro[.]  More like 2500-3000[.]" Erny would go on to pay Gillespie a $2,500 bribe in exchange for removing the outstanding balance owed to Baltimore City on each property.

In total, Erny paid Gillespie at least $25,000 in bribes in connection with the scheme and caused losses to Baltimore City of at least $147,484.29.

### CARES Act Fraud Scheme

***PPP Loan ($996,240) – The Jackson Group***

On or about April 2, 2021, co-conspirator Ahmed Sary, with the assistance of Erny, submitted a fraudulent PPP loan application to Cross River Bank to obtain a PPP loan for The Jackson Group—a real estate business owned by Erny. The PPP loan application contained multiple material misrepresentations, including that The Jackson Group in 2019 had 63 employees and an average monthly payroll of $398,496.38.

In support of the loan application, a fabricated 2019 Internal Revenue Service (IRS) Form 940—Employer's Annual Federal Unemployment Tax Return—was submitted, which falsely indicated that the entity's "[t]otal payments to all employees" in 2019 was $4,781,956.78. The IRS Form 940 was not legitimate, and the information within it was false.  In fact, The Jackson Group had no employees and did not report paying any wages to or withholding federal income tax from any employees during the 2019 tax year—as confirmed by IRS records.

Additionally, Erny provided Sary copies of various documents to be submitted in connection with the PPP loan application, including photographs of his driver's license. Based on the false representations and fraudulent submissions made on behalf of Erny as the owner of The

Jackson Group on April 3, 2021, the PPP loan was funded, and approximately $996,240 was distributed by Cross River Bank to a BB&T bank account controlled by Erny.  The distribution of these funds caused the transmission of interstate wires to and from Maryland.

Erny agreed to pay Sary a kickback payment for his work in submitting the false application and obtaining the fraudulent PPP loan. After the PPP loan funds were received by Erny, Erny provided Sary with seven checks, totaling $192,000 (approximately 20% of the PPP loan amount)—which were drawn on The Jackson Group's bank account controlled by Erny. The payments were structured into seven checks to launder the funds and disguise the true nature of the payments. Also, several of the checks contained false information in the memo line, such as "marketing," "supply's," "uniforms," and "transport," which was meant to further obfuscate the true nature of the payments. On each of those checks, Erny left the payee name blank.  Thereafter, Sary—to launder the proceeds and attempt to conceal their nature and purpose—wrote a different payee name on each of those checks and deposited them in accounts he controlled.

Approximately one month after The Jackson Group PPP loan was funded, a portion of the Jackson Group Inc PPP loan was reversed out of the BB&T bank account ending in 54629 by Cross River Bank. A note in Cross River records on May 7, 2021, indicated that The Jackson Group PPP loan application was "Suspected of fraud" and the bank was "requesting recall of funds." On May 10, 2021, $695,278.78 were force-debited from The Jackson Group's BB&T bank account ending in 54629. Despite the suspicion of fraud, Erny retained approximately $300,961.22 in PPP loan proceeds (as calculated by the initial loan disbursement of $996,240 minus the reversed amount of $695,278.78).

Shortly after the bank transaction reversal, Sary returned a portion of the kickback payments he had received from Erny (approximately $79,689). The return of the kickback

payments was patterned in a similar way as the initial kickback checks had been paid.  There were multiple checks in differing amounts, the checks were drawn from two different bank accounts, and they were made out to different payees, but noted in their memo line that they were intended for Erny: their memo lines noted "Acct of James Erny."

***Establishment of Payroll for Purported Employees***

According to the parameters of the PPP, proceeds from a PPP loan were required to be used only for certain permissible business expenses, including payroll costs, mortgage interest, rent, and utilities. Erny and Sary were aware that, under the applicable PPP rules, interest and principal on a legitimate PPP loan were eligible for forgiveness, if the business spent the loan proceeds on permissible items within a designated period of time and used a certain portion of the loan toward payroll expenses.

Accordingly, in an attempt to make it appear that the PPP loan funds were being used for legitimate purposes, in April 2021, Erny, at the suggestion of Sary, signed an agreement with Heartland Payment Systems, Inc. ("Heartland") to provide payroll services to purported employees of The Jackson Group. Pursuant to the agreement, and at the direction of Erny, Heartland withdrew funds from the BB&T account referenced above and made payments using the PPP funds to purported employees of the Jackson Group, including Erny, his mother, aunt and various other friends and associates.

The purpose of establishing payroll services for The Jackson Group after receipt of the PPP loan was to facilitate the creation of documentation that could be used to substantiate a request for the PPP loan to be forgiven.

In total, $24,510.43 in sham payroll payments were made using funds traceable to the PPP loan obtained by Defendant and The Jackson Group. None of the purported employees were in

fact legitimately employed by The Jackson Group during the time period after the PPP loan was received. Erny ultimately did not make any payments to Cross River Bank in connection with the PPP loan obtained for The Jackson Group.

Records obtained from Apple, Inc. in response to a federal search warrant for Erny's iCloud account revealed that Erny made various notes about the scheme, including "What risk do my payees face?  Mom?  Do the SS#s have to be real?  Will the Govt contact my payees."  He also emailed Sary with questions about the payroll scheme and his purported employees, asking, among other things, "Same last name ok? . . . Do banks get a flag for a certain amount of cash and check withdrawal?   Like 10K I've heard?  Can you transfer money with in the same bank like checking to saving without drawing attention?"

### EIDL Attempts – The J-Jackson Group & St. Paul Assisted Living

In addition to the fraudulent PPP loan, Erny, with the assistance of Sary, on September 12, 2021 attempted to obtain a fraudulent EIDL for a purported business called The J-Jackson Group, Inc. in the amount of $138,000. However, this loan ultimately did not close. He also attempted to obtain two fraudulent EIDLs for a purported business called St. Paul Assisted Living on April 7, 2020 and September 2, 2021. These loans did not close either.

### Spending of PPP Funds

Erny spent the fraudulently obtained loan proceeds in various ways that were impermissible under the PPP program, including by paying $192,000 in kickbacks to Sary, using the funds to make a $17,200 cash withdrawal for himself, paying off various personal debts, paying contractors for work on various properties he owned, and providing PPP funds to various family members (including his mother, uncle, and relatives of his wife).

8

## II.    SENTENCING GUIDELINES CALCULATION

### Bribery Concerning Programs Receiving Federal Funds (count of conviction)

Pursuant to United States Sentencing Guidelines (U.S.S.G.) §2C1.1(a), the base offense level is 12. That offense level is increased two levels because the offense involved more than one bribe, pursuant to U.S.S.G. § 2C1.1(b)(1). Pursuant to U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(E), there is an 8-level increase because the agreed upon amount loss for the offense was more than $95,000 but was less than $150,000. The total offense level for this offense is 21.

### Wire Fraud (relevant conduct)

The parties have agreed that the Stipulation of Facts specifically establishes the commission of a wire fraud offense pursuant to U.S.S.G. § 1B1.2(c). The base offense level is 7, pursuant to U.S.S.G. § 2B1.1(a)(1). Pursuant to U.S.S.G. §2B1.1(b)(1)(H), there is a 14-level increase because the loss amount was more than $550,000 but less than $1,500,000. There is a further two-level increase, pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the offense otherwise involved sophisticated means and the Defendant intentionally engaged in or caused the conduct constituting sophisticated means. The total offense level for this offense is 23.

### Grouping

Pursuant to U.S.S.G. § 3D1.4, counting one unit for the Group for the offense of conviction and one unit for the wire fraud offense results in an increase of 2 levels to the Group with the highest offense level (23)—for a total of 25. This offense level is reduced two levels for acceptance of responsibility and an additional level for the Defendant's timely notification of intent to plead guilty. There is an additional two-level reduction because the Defendant is a zero-point offender. Thus, the total offense level is 20 which, combined with a Criminal History Category of I, results in a Sentencing Guidelines range of 33 to 41 months.

III.   **SENTENCING RECOMMENDATION**

"In sentencing a Defendant, first the district court 'shall consider ... the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of Defendant as set forth in the guidelines.' 18 U.S.C. § 3553(a)(4)(A)." Regarding sentencing, the Supreme Court states, "the Guidelines should be the starting point and initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines are the "natural starting point from which the sentencing court exercises its discretion under § 3553(a). *United States v. Langford*, 516 F.3d 205, 212 (3d Cir.2008). This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual Defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009). Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the Defendant. Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the Defendant; and to provide the Defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Another factor that Section 3553(a) considers are similar sentences for similarly situated Defendants to avoid sentence disparities.  18 U.S.C. § 3553(a)(6).

Notwithstanding the above, decades ago, the Supreme Court recognized the special character of criminal sentencing proceedings:

> Highly relevant—if not essential—to [the judge's] selection of an appropriate
> sentence is the possession of the fullest information possible concerning the

10

> defendant's life and characteristics.  And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigorous adherence to restrictive rules of evidence properly applicable to the trial.

*Williams v. State of New York*, 337 U.S. 241, 247 (1949) (Black, J.). That principle has been codified for sentencing proceedings in the federal criminal courts by 18 U.S.C. § 3661, which provides that: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

A. **The Nature and Circumstances of the offense and the Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.**

Defendant Erny stands before the Court having committed two separate crimes, each serious in nature. The count of conviction is Erny for bribery, which is an appropriate place to begin. Erny, through his pattern of corrupt activity, contributed to the deprivation of the residents of Baltimore City of honest government. Even though Erny did not bribe an elected official or high-ranking employee, his crime nonetheless meant that there would be less money in the City's bank account. That meant those funds would need to be replaced, either by additional fees or taxes, or by cutting services.[1] But the harm extended beyond the financial damage it represented. It also created a lack of trust in Government. The Defendant's actions themselves show a brazen disregard for the integrity of Government, and his statements show a general contempt for its processes. When he thought no one was watching, Erny stated, "I'm happy to pay u instead of corrupt politicians." The saddest part of this crime is that, while Defendant Erny espoused a personal belief that Government is corrupt, his actions contributed to the negative views of others.

---

[1] Baltimore's financial woes are well documented. *See, e.g., Baltimore could face $1.8B budget deficit over 10 years finance officials project*, The Baltimore Banner, Adam Willis (Dec. 14, 2023).

The agreed-upon statement of facts demonstrates that Erny's actions were no isolated incident. He sought to have his water bills reduced through the payment of bribes to Joseph Gillespie over the course of over three years. Each one of these instances was another attempt for him to correct his behavior. Each act was another individual decision to place his financial needs over those of others. While Defendant Erny is properly a Criminal History Category I and receives the benefits of having no criminal history, his crime is no mere aberration or one-off transaction.

The Court should also consider the agreed relevant conduct of Enry's Payroll Protection Plan fraud. As the Court well-knows, pandemic fraud is a serious offense. The PPP was designed to be a safety net to keep the nation's small business in operation during the most significant global pandemic in 100 years. Unfortunately, due to the conduct of people like the Defendant, a staggering amount of pandemic relief funds did not reach the businesses and employees that needed those funds most. The Small Business Administration Office of Inspector General estimates that as much as 17% of the disbursements from pandemic-relief programs like the PPP went to fraudulent applicants like Defendant.[2] Indeed, the PPP had a finite pool of money; during the first round of the PPP, the program was depleted in just 13 days.[3] Given the high levels of fraud in connection with PPP funds, there is a particularly substantial need to promote respect for the law and provide just punishment for the offense.

---

[2] *See* Small Business Administration, COVID-19 Pandemic EIDL and PPP Loan Fraud Landscape Report, *available at* https://www.sba.gov/document/report-23-09-covid-19-pandemic-eidl-ppp-loan-fraud-landscape ("We estimate that SBA disbursed over $200 billion in potentially fraudulent COVID-19 EIDLs, EIDL Targeted Advances, Supplemental Targeted Advances, and PPP loans. This means at least 17 percent of all COVID-19 EIDL and PPP funds were disbursed to potentially fraudulent actors.")

[3] *See* PBS Newshour, It took 13 days for the Paycheck Protection Program to run out of money. What comes next?, *available at* https://www.pbs.org/newshour/politics/it-took-13-days-for-the-paycheck-protection-program-to-run-out-of-money-what-comes-next

The Defendant played a small role in a larger fraud run by co-conspirator Ahmed Sary. However, even just focusing on the Defendant's individual fraud, he still caused a loss of hundreds of thousands of dollars. These were funds meant to help workers struggling to get a paycheck during the pandemic. They were not meant to be used to pay off Erny's personal debts, to pay Erny's family members, or to pay kickbacks to Defendant Erny's co-conspirators.

Erny's actions of trying to mask his actions show his criminal intent and increase the seriousness of his offense. As established in the statement of facts, in an attempt to make it appear that the PPP loan funds were being used for legitimate purposes, Erny established a sham payroll that could be used to substantiate a request for the PPP loan to be forgiven. In total, Erny caused the payment of over $24,000 in sham payroll payments using funds traceable to the PPP loan obtained by Defendant. None of these purported employees were in fact legitimately employed. These badges of fraud and concealment just further highlighted the seriousness of the offense and the Defendant's disrespect for the law.

## B. The Need to Avoid Unwarranted Sentencing Disparities.

The need to avoid unwarranted sentencing disparities is also important in this case. While no two defendants are precisely the same, and the facts and circumstances of every case are different,[4] it still may be instructive for the Court to consider sentences imposed in connection with cases involving pandemic fraud such as this one.

Joseph Gillespie, Crim. No. RDB-23-0321, received a 48-month sentence despite a lack of criminal history for his receipt of bribes and his own wire fraud scheme. Gillespie's sentencing is the most apt comparison, given that it involved the same offenses, with the

---

[4] *See, e.g.*, *United States v. Friend*, 2 F.4th 369, 382–83 (4th Cir. 2021) ("Courts have repeatedly made clear that comparisons of sentences may be treacherous because each sentencing proceeding is inescapably individualized.").

difference being their respective roles. It is appropriate for the Court to have imposed a higher

sentence on Gillespie. He is, after all, a public official who violated the public's trust. Moreover,

Gillespie received bribes from individuals other than Erny, and thus had a higher loss associated

with his conduct. A sentence of 27 months is less than that given to Gillespie, but still sufficient

to account for the Defendant's crime.

The Court can also look to the sentences imposed in other similar PPP fraud cases for

guidance:

- *United States v. Sary*, Crim. No. RDB-23-344 (seven years imposed on defendant with no criminal history who was responsible for over $17 million dollars in fraud). Sary's sentencing guideline range was 108 to 135 months' imprisonment. He had no criminal history.

- *United States v. Glenn*, Criminal No. RDB-23-0027 (65 months imposed on defendant whose conduct caused the loss to victims of over three million dollars in PPP and EIDL funds).

- *United States v. Walker*, Crim. No. RDB-22-290 (24 months imprisonment and 6 months home confinement imposed on defendant who was responsible $262,252 in fraud). Walker's sentencing guidelines range was 30-37 months' imprisonment.

- *United States v. Hopkins*, Crim. No. RDB-23-316 (24 months imprisonment and 1 year home confinement imposed on defendant with no criminal history who was responsible for $1,018,224 in fraud). Hopkins' sentencing guidelines range was 41-51 months imprisonment. He had no criminal history.

- *United States v. Qureshi*, Crim. No. JKB-22-0330 (year and a day sentence imposed on defendant with no criminal history who was responsible for $250,723 in fraud). Qureshi's sentencing guidelines range was 12-18 months' imprisonment. He had no criminal history.

All told, the Government's requested sentence in this case is certainly reasonable. The

sentencing request falls lower than the more culpable Sary and the more culpable Gillespie, but

within a reasonable range considering other sentences.

14

## **CONCLUSION**

The Government respectfully requests the Court sentence the Defendant to a term of incarceration of 27 months. This sentence is supported by the factors found in 18 U.S.C. § 3553(a), and is an appropriate in this case.

Respectfully submitted,

Kelly O. Hayes
United States Attorney


By: _____
Sean R. Delaney
Assistant United States Attorney

15

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 17, 2026, a copy of the foregoing Motion to Seal was delivered via ECF to counsel for the Defendant.


By: _____

Sean R. Delaney
Assistant United States Attorney