# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Criminal No. RDB-25-162 |
| v. | The Honorable Richard D. Bennett |
| **JAMES CARROLL ERNY, JR.,** | Sentencing: July 22, 2026, 2:30 p.m. |
| Defendant. | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING AND REQUEST FOR A NONCUSTODIAL SENTENCE

COMES NOW the Defendant, James Carroll Erny, Jr., by and through his undersigned retained counsel, Tony N. Garcia, Esq., of Garcia Law, PC, and respectfully submits this Memorandum in Aid of Sentencing and Request for a Noncustodial Sentence, and in support thereof states as follows:

## I.  INTRODUCTION

Three men made the schemes that bring James Erny before this Court, and this Court has already sentenced two of them. Joseph Gillespie was the Baltimore City finance employee who, for seven years, sold the powers of his office to property owners across the City — "I'm just your inside man," he explained on a federal recording; "[t]hat's what I do for a lot of different people."[1]

This Court sentenced Gillespie to forty-eight months. Ahmed Sary was the professional who manufactured fraudulent CARES Act applications at industrial scale — eighty-five Paycheck Protection Program applications seeking $14.8 million, fifty-seven Economic Injury Disaster Loan applications seeking $3 million more — and pocketed $959,559

---

[1]Press Release, U.S. Att'y's Office, Dist. of Md., *Former Baltimore Department of Finance Employee Sentenced to Four Years in Connection with Bribery and COVID-19 CARES Act Scheme* (Feb. 20, 2025); *United States v. Gillespie*, No. 1:23-cr-00321-RDB (D. Md.). Gillespie's scheme ran from 2016 through 2023; Mr. Erny did not enter it until, at the earliest, December 2019 — three years after Gillespie began serving "a lot of different people." Attach. A; PSR ¶¶ 12, 18.

doing it. This Court sentenced Sary to eighty-four months, with a year of home detention to follow.[2]

James Erny was a customer of both. He does not stand before the Court as their equal in culpability. What remains for the Court is not whether Mr. Erny will be punished. He will be. The felony conviction, the forfeiture judgment of $300,961.22, the restitution obligation of $448,445.51, and the sentence proposed here are punishment by any honest measure. The question is the *form* punishment should take — and whether that form will leave intact the one thing every interest in this case depends upon: a fifty-five-year-old first offender's capacity to earn and to repay, dollar by dollar, what his offenses cost.

Punishment that destroys the means of repayment punishes the victims twice. Punishment fitted to this man — confinement to his home, supervision, and a restitution schedule enforced by the coercive power of this Court — vindicates the law and pays the City of Baltimore and the taxpayers back. Mr. Erny respectfully requests a sentence of one year of probation with a six-month term of home detention, restitution as structured in Part VI.F below, and no fine, consistent with the recommendation of the United States Probation Office. PSR, Sentencing Recommendation.

## II.  SUMMARY OF THE ARGUMENT

*First*, the sentence the defense requests is authorized several times over. The Government has moved for a two-level reduction for substantial assistance under U.S.S.G. § 5K1.1; the Guidelines' own zero-point-offender provision invites "a departure ... to a sentence other than a sentence of imprisonment" where the range overstates the gravity of the offense, U.S.S.G. § 5C1.1 cmt. n.10(B); and § 3553(a) independently permits the same result by variance, as *Gall v. United States*, 552 U.S. 38, 59–60 (2007), affirmed from a materially identical Zone D range. The plea agreement expressly reserves to the defense the right to seek "a sentence outside the advisory Guidelines range." Plea Agreement ¶ 9.

*Second*, Mr. Erny's history and characteristics are precisely what § 3553(a)(1) exists to weigh: a childhood of violence, sexual abuse, and loss that would have broken most men; a

---

[2] Press Release, U.S. Att'y's Office, Dist. of Md., *Baltimore Man Sentenced to Seven Years in Connection with a Scheme to Fraudulently Obtain Almost $18 Million in Fraudulent COVID-19 Loans* (June 25, 2024). Docket number to be confirmed.

life built anyway — degrees earned, classrooms taught, businesses run for twenty-three years; a marriage of twenty-seven years and two daughters in college; and *zero* criminal history points at age fifty-five. PSR ¶¶ 74, 79–80, 88–115.

*Third*, the empirical evidence is one-directional. Offenders like Mr. Erny — zero criminal history points, over fifty, college-educated — reoffend at rates in the single digits to low teens. The Sentencing Commission's own data identify him as belonging to "the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend."

*Fourth*, § 3553(a)(6) does the arithmetic. The official who ran the bribery marketplace for seven years and cost the City more than $1.25 million received 48 months from this Court. The professional who built the PPP fraud received 84 months. A below-Guidelines, noncustodial sentence for the zero-point customer preserves — rather than distorts — the proportionality this Court has already built into this family of cases.

*Fifth*, probation with home detention is substantial punishment, *Gall v. United States*, 552 U.S. 38, 48 & n.4 (2007), and it is the only sentence that serves § 3553(a)(7) — "the need to provide restitution to any victims of the offense." Imprisonment would extinguish the roughly $8,000 in monthly self-employment income, PSR ¶¶ 111–12, that must fund $448,445.51 in restitution, at a cost to the taxpayers of $54,900 per year, PSR ¶ 129.

*Sixth*, restitution should be ordered at the stipulated amount and no more; correctly directed to the entity that actually bears each loss today; credited with every dollar Mr. Erny has already repaid and the victims have already recovered; coordinated with the forfeiture money judgment so the same $300,961.22 is not collected twice; scheduled to his documented ability to pay, 18 U.S.C. § 3664(f)(2); and ordered without interest, 18 U.S.C. § 3612(f)(3)(A).

## III.  BACKGROUND

### A. The offense conduct and the plea.

The account that follows is drawn from, and consistent with, the parties' Stipulation of Facts, Plea Agreement, Attachment A, and the Presentence Report, PSR ¶¶ 8–46. Mr. Erny does not quarrel with a word of it.

For more than two decades, Mr. Erny has been a self-employed landlord and property manager, owning eight rental properties in Baltimore City and operating Saint Paul Assisted Living, a licensed assisted-living business. PSR ¶¶ 110–12. The properties carried heavy municipal obligations — water bills and property taxes among them — and by the end of the last decade, several of those obligations had grown to sums Mr. Erny believed were, at least in part, the product of billing error, and which he had pressed through legitimate channels without success.[3] What happened next was neither legitimate nor excusable, and Mr. Erny has never pretended otherwise: beginning in or about December 2019 and continuing until August 2023, he paid bribes — at least $25,000 in cash, Cash App, and Zelle payments — to Joseph Gillespie, an employee of the Baltimore City Department of Finance, in exchange for Gillespie's extinguishing financial obligations Mr. Erny owed the City, causing losses to the City of at least $147,484.29. Plea Agreement, Attach. A; PSR ¶¶ 12–13, 28.

The Stipulation also establishes a second scheme. In the spring of 2021, Mr. Erny, with the assistance of Ahmed Sary, obtained a fraudulent PPP loan of $996,240 for The Jackson Group, his real-estate business, supported by a fabricated IRS Form 940 and false payroll figures. Attach. A; PSR ¶¶ 30–34. Within roughly five weeks, Cross River Bank flagged the loan as suspected fraud and clawed back $695,278.78 — more than two-thirds of the proceeds. Attach. A; PSR ¶¶ 36–37. Mr. Erny retained $300,961.22, of which he paid $192,000 to Sary as the professional's kickback (Sary later returned approximately $79,689). Attach. A; PSR ¶¶ 35, 38. Mr. Erny also attempted, through Sary, to obtain EIDL loans; none ever closed, and those attempts caused no loss. Attach. A; PSR ¶ 45.

On May 29, 2025, the grand jury returned a one-count indictment charging Bribery Concerning Programs Receiving Federal Funds, 18 U.S.C. § 666(a)(2). Indictment; PSR ¶ 1. Mr. Erny was released on his personal recognizance at his initial appearance on June 11, 2025 — without Pretrial Services supervision — and has remained at liberty, without incident, ever since. PSR ¶ 7. Offered a plea agreement on February 18, 2026, he accepted it promptly and entered his guilty plea on March 5, 2026, stipulating not only to the bribery but — voluntarily

---

[3]In or about 2020, Mr. Erny wrote to City and State officials — including the Comptroller's, Mayor's, and Governor's offices — and to local media, seeking correction of water billing he believed erroneous. Ex. ___. The letter is offered not to relitigate the bills (the stipulated loss figure stands as a ceiling) but as context for the frustration from which the corrupt shortcut grew, and as evidence that Mr. Erny first sought help where a citizen is supposed to seek it.

— to the wire-fraud conduct as well, U.S.S.G. § 1B1.2(c), ensuring his Guidelines range would be calculated on the whole of what he did. Plea Agreement ¶ 6; PSR ¶¶ 2, 52.

### B. The life that preceded it.

The Probation Office, having heard it all, chose its own words: Mr. Erny "managed to overcome that adversity and establish himself." PSR, Sentencing Recommendation. The adversity deserves to be stated plainly, because § 3553(a)(1) requires the Court to weigh the whole man, *Pepper v. United States*, 562 U.S. 476, 487–88 (2011), and because it is the kind of history that ordinarily ends in a criminal-history category far higher than zero.

James Erny was born in 1971 in Petersburg, Virginia, to a father whose mental illness governed the household. PSR ¶¶ 89, 92. The father beat the boy, beat his mother, and beat their animals; he forced his son to kill rabbits with a hammer for dinner; he locked the boy outside with the livestock for days at a time after the divorce. PSR ¶¶ 92, 94. When James was in the fourth grade his mother remarried — and the stepfather sexually abused him from the fourth grade to the sixth, until the stepfather was arrested, convicted, incarcerated, and deported for sexual abuse of minors. PSR ¶ 95. When James was seventeen, his father died by suicide from a self-inflicted gunshot wound. PSR ¶ 89.

In the eleventh grade, in an accident that has never left him, he accidentally ran over his girlfriend with his pickup truck, and she died of her injuries. PSR ¶ 96. By the twelfth grade he was in a thirty-day inpatient mental-health facility for the rage all of this had produced. PSR ¶ 102.

What he did with that inheritance is the part the Guidelines cannot see. Boy Scouts from age nine; captain of the wrestling team; a Bachelor of Science from James Madison University; a Master's degree from William & Mary; years teaching biology and anatomy at Essex High School in Virginia and at Baltimore City College High School. PSR ¶¶ 96, 109, 114. He has been married to Shannon, a dentist, since 1999; their daughters, Jane and Susan, are both full-time college students; he speaks daily with his seventy-five-year-old mother and supports an incarcerated half-sister financially because, as his aunt put it, "he has a sense of responsibility for her." PSR ¶¶ 89–91, 98.

That aunt — Kim Scarborough-Sykes, a drug-rehabilitation and family counselor — called him a "miracle" and "a good person" given "how he was raised and the experiences

he's lived through." PSR ¶ 97. For the last twenty-three years he has built and run the small businesses that now hold his repayment capacity: eight rental properties and a licensed assisted-living facility, together producing roughly $8,000 in monthly income. PSR ¶¶ 110–12.

He carries the predictable scars: diagnoses of depression and anxiety, treated with medication and outpatient care at Greater Baltimore Medical Center since 2022; hypertension and high cholesterol; and a 2022 accident that nearly severed his foot and kept him from walking for a year. PSR ¶¶ 100–01, 104. He is fifty-five years old. His criminal history score is zero. PSR ¶¶ 79–80.[4]

### C. The thirteen months since: unsupervised liberty, acceptance, and repayment.

Since June 11, 2025, Mr. Erny has been exactly where the defense asks the Court to leave him — at home, at work, under the least restrictive conditions the system knows — and he has passed that test for more than thirteen months without a single reported violation. PSR ¶ 7. The Probation Office conducted a home assessment of the Glen Arm residence he shares with his wife and daughter on March 23, 2026, and found "no unusual findings." PSR ¶ 99. He admitted his conduct to the probation officer without hedging. PSR ¶ 50. Probation found no obstruction of any kind. PSR ¶ 49.

And he has already begun to pay. Mr. Erny is presently making payments of $1,700 per month on the SBA repayment schedule associated with the very PPP loan at issue — a voluntary act of repayment undertaken before any court ordered him to do it. Ex. ___ (payment records). Acceptance of responsibility, in this case, is not a Guidelines adjustment; it is a monthly check.

## IV.  THE ADVISORY GUIDELINES RANGE

The calculation is not in dispute. The parties stipulated, and Probation found: a combined adjusted offense level of 25 across the bribery count and the stipulated wire-fraud conduct; a two-level reduction under U.S.S.G. § 4C1.1 because Mr. Erny is a Zero-Point Offender meeting every criterion of §§ 4C1.1(a)(1)–(11); and a three-level reduction for

---

[4]Mr. Erny's history contains only three decades-old minor matters — a 1991 trespassing citation, a 2003 failure-to-obey citation resolved by fine, and a 2009 DUI resolved by probation before judgment — none scoring any criminal-history points. PSR ¶¶ 77–80. His profile is materially indistinguishable from the Commission's lowest-risk cohort.

acceptance of responsibility under § 3E1.1, for a total offense level of 20. PSR ¶¶ 53–74; Plea Agreement ¶ 6.

At Criminal History Category I, the advisory range is 33 to 41 months. PSR ¶ 120. Because that range sits in Zone D, the Guidelines — as distinct from the statute — would make him ineligible for probation, U.S.S.G. § 5B1.1, cmt. n.2; PSR ¶ 125, a point addressed in Part VI.D below. By statute he is eligible: the offense is a Class C felony carrying one to five years of probation. 18 U.S.C. § 3561(c)(1); PSR ¶ 124. The Government has since moved, pursuant to U.S.S.G. § 5K1.1, for a two-level reduction in recognition of Mr. Erny's substantial assistance and cooperation — a departure that would bring the offense level to 18 and the corresponding range to 27 to 33 months, and that independently authorizes a sentence below the advisory range. *See infra* Part VI.D.

Two features of the calculation deserve the Court's attention, not as objections — there are none — but as § 3553(a) context. *First*, fourteen of the twenty-five combined levels are driven by a single input: a loss figure of $996,240, U.S.S.G. § 2B1.1(b)(1)(H); PSR ¶ 61, measured by the amount *disbursed* rather than the amount *kept*. The realized loss is $300,961.22 — less than a third of the figure driving the enhancement — because the bank recovered $695,278.78 within weeks. Attach. A; PSR ¶¶ 36–37. Courts have long recognized that the fraud-loss tables can produce sentences unmoored from real culpability: as Judge Rakoff put it, the loss guideline's "fetish with absolute arithmetic" can work "the utter travesty of justice that sometimes results from the [g]uidelines' ... piling-on of ... points." *United States v. Adelson*, 441 F. Supp. 2d 506, 509–12 (S.D.N.Y. 2006); *accord United States v. Parris*, 573 F. Supp. 2d 744, 745–52 (E.D.N.Y. 2008) (Block, J.) (loss-driven ranges in fraud cases can become "patently absurd"). This Court possesses the same authority to weigh how loosely that number fits actual harm. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

The Guidelines even supply their own remedy: § 2B1.1 authorizes a downward departure "in a case in which the offense level substantially overstates the seriousness of the offense," U.S.S.G. § 2B1.1 cmt. n.21(C) — the archetypal such case being one in which the tabulated loss dwarfs the harm actually inflicted, because "the amount stolen is a relatively weak indicator of the moral seriousness of the offense." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427–28 (S.D.N.Y. 2004). Here the tabulated $996,240 exceeds the realized loss of

$300,961.22 by more than triple — a textbook predicate for departure under Note 21(C), and a further measure of the overstatement that Part VI.D's zero-point departure independently addresses.

*Second*, the Judiciary Sentencing Information (JSIN) report attached to the Presentence Report is telling on its own terms. For the eleven defendants nationwide over FY2021–2025 whose primary guideline was § 2C1.1, with a final offense level of 20 and Criminal History Category I — after excluding those who received a § 5K1.1 substantial-assistance departure — one defendant received no term of imprisonment at all, and for the ten (91%) who received imprisonment in whole or in part, the average term imposed was 26 months and the median 28. PSR at 27 (Judiciary Sentencing Information (JSIN)) (FY2021–2025; primary guideline § 2C1.1; final offense level 20; Criminal History Category I; excluding § 5K1.1 departures).

That a noncustodial sentence appears even within this small, cooperation-excluded cohort — and that its average custodial term falls below the 33-month floor of Mr. Erny's range — confirms the range overstates the sentence this profile ordinarily draws, before Mr. Erny's individual circumstances, or his own § 5K1.1 motion, are weighed at all.

## V. THE GOVERNING FRAMEWORK

The Guidelines are advisory, *United States v. Booker*, 543 U.S. 220, 245 (2005), and although they are the starting point and the initial benchmark, they are not only not mandatory on sentencing courts; they are also not to be presumed reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam); *accord Rita v. United States*, 551 U.S. 338, 351 (2007); *Gall*, 552 U.S. at 49–50. The Court must instead "make an individualized assessment based on the facts presented" and impose a sentence "sufficient, but not greater than necessary" to serve the purposes of 18 U.S.C. § 3553(a)(2). *Gall*, 552 U.S. at 49–50. The tradition the statute codifies is older than the Guidelines: the sentencing judge is "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper*, 562 U.S. at 487–88 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

And Congress has been emphatic that "[n]o limitation shall be placed on the information concerning the background, character, and conduct" of the defendant that the Court may consider. 18 U.S.C. § 3661. On review, a district court's judgment that the § 3553(a)

factors justify even a "substantial" variance is owed "due deference." *United States v. Diosdado-Star*, 630 F.3d 359, 366–67 (4th Cir. 2011).

## VI.  ARGUMENT

### A. The history and characteristics of this defendant call for a sentence that credits the whole life, not the worst four years of it.

Section 3553(a)(1) is not sentiment; it is a command. The Court must weigh "the history and characteristics of the defendant" — all of them. Three features of this history bear directly on the sentence.

*The trauma is documented, verified, and causally honest.* The record of Mr. Erny's childhood — the beatings, the sexual abuse from fourth to sixth grade, the father's suicide, the fatal accident at seventeen — comes not from advocacy but from the Presentence Report, corroborated by his aunt, a professional counselor, who watched it happen. PSR ¶¶ 89–98. The defense does not offer this history as an excuse; a fifty-year distance separates that boy from these offenses, and Mr. Erny has never blamed his childhood for his conduct. It is offered because the law requires the Court to see it, and because it explains the man the Probation Office itself described: one who "managed to overcome that adversity and establish himself." PSR, Sentencing Recommendation. A first felony conviction at fifty-five, against that backdrop, is an aberration in a life of lawful striving — and the sentence should treat it as one.

*The support system that predicts success is intact and verified.* A twenty-seven-year marriage; a daughter at home; daily contact with his mother and aunt; a five-bedroom home Probation has inspected and approved. PSR ¶¶ 91, 99. These are not abstractions — they are the confinement infrastructure for the sentence requested here.

*The mental-health needs are real and are being treated in the community.* Mr. Erny is in outpatient treatment at GBMC and medicated for depression and anxiety, PSR ¶ 104, and the defense joins Probation's recommendation of mental-health and substance-abuse treatment conditions, PSR, Sentencing Recommendation, and welcomes testing. Continuity of that treatment — like continuity of income — argues for a community sentence. U.S.S.G. § 5H1.3.

**B. A zero-point, fifty-five-year-old, college-educated first offender presents as close to zero risk as the data can measure.**

The Sentencing Commission has already told the courts what to expect from a man with this profile, and the Guidelines themselves now embody it. The two-level Zero-Point Offender reduction of § 4C1.1 — which the Government did not oppose, Plea Agreement ¶ 6.k, and Probation applied, PSR ¶ 71 — exists because the Commission's recidivism research showed that offenders with no criminal history points reoffend at markedly lower rates than everyone else. U.S.S.G. amend. 821 (eff. Nov. 1, 2023). The underlying data are striking: federal offenders with no prior arrests whatsoever were rearrested at a rate of 6.8 percent, the lowest of any group the Commission has measured — "the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend." U.S. Sent'g Comm'n, *Recidivism and the "First Offender"* 13–17 (May 2004).

Age compounds the effect: among Criminal History Category I offenders aged sixty and older, the rearrest rate was 11.3 percent, against 53.0 percent for those under thirty; college graduates in the older cohorts were rearrested at 11.6 percent. U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 22–23, 25 (Dec. 2017). Mr. Erny will be fifty-five at sentencing and past sixty before a Guidelines sentence would end.

Specific deterrence and protection of the public, 18 U.S.C. § 3553(a)(2)(B)–(C), are therefore served by supervision, not by a cell. What remains is general deterrence — and the criminological consensus, embraced by the Department of Justice's own research arm, is that "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment," and that increases in sentence severity produce no measurable marginal deterrence. Nat'l Inst. of Justice, *Five Things About Deterrence* (2016). Certainty has been delivered in this case: a federal felony conviction, a $300,961.22 forfeiture judgment, $448,445.51 in restitution, the loss of his good name in the city where he has done business for twenty-three years, and the sentence proposed here.

**C. Section 3553(a)(6): this Court has already priced the architects; the customer's sentence should preserve the proportion.**

The command to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), has

unusual bite here, because the comparators are not statistical abstractions — they are the co-participants in these very schemes, and this Court sentenced both.

Section 3553(a)(6) speaks in national terms, and its national inquiry is independently satisfied here: the JSIN report attached to the Presentence Report shows that, for Mr. Erny's exact cohort (§ 2C1.1; offense level 20; Criminal History Category I; § 5K1.1 recipients excluded), the average custodial term over FY2021–2025 was 26 months — below the 33-month floor of his advisory range — while one of the eleven such defendants received no imprisonment at all. PSR at 27 (JSIN).

But the factor's animating purpose is proportionate punishment, and that purpose is served most vividly by the comparison this Court is uniquely positioned to make: to the co-participants in these very schemes, whom it sentenced itself. Section 3553(a)(6) does not compel the Court to match Mr. Erny's sentence to any co-participant's; a sentence "is not unreasonable under § 3553(a)(6) merely because it creates a disparity with a co-defendant's sentence." *United States v. Gillespie*, 27 F.4th 934, 945 (4th Cir. 2022).[5] The defense does not ask the Court to equalize mechanically; it asks the Court to do what § 3553(a)(2)(A) affirmatively invites, and what Gillespie leaves open — to weigh, in its individualized assessment, the proportionality of Mr. Erny's sentence against those of the co-participants it sentenced in these very schemes. And the "similarly situated" inquiry cuts in Mr. Erny's favor: where the defendant in Gillespie drew a longer term because he alone declined to plead or cooperate, here it is Mr. Erny who accepted responsibility and cooperated, while the architects who did more received more.

| Participant | Role in the schemes | Scope | Disposition |
|---|---|---|---|
| **Joseph Gillespie** | Baltimore City Finance employee — the "inside man" who sold his office | Accepted >$250,000 in bribes across the City, 2016–2023; caused >$1.25M in City losses; separate $138,000 PPP fraud | 48 months' imprisonment; 3 yrs supervised release (this Court, Feb. 20, 2025) |
| **Ahmed Sary** | Professional facilitator of CARES Act fraud | 85 fraudulent PPP applications ($14.8M); 57 EIDL applications ($3.09M); received $959,559; 20–30% kickbacks | 84 months' imprisonment; 3 yrs supervised release incl. 12 months home detention (this Court, June 25, 2024) |

---

[5]The Fourth Circuit's decision in *United States v. Gillespie*, 27 F.4th 934 (4th Cir. 2022), concerns an unrelated defendant; its shared surname with co-defendant Joseph Gillespie is coincidental.

| Participant | Role in the schemes | Scope | Disposition |
|---|---|---|---|
| James Erny | Property owner; bribe payer as to his own bills; one-time PPP borrower through Sary | Paid ≥$25,000 in bribes on his own obligations; single PPP loan, $695,278.78 recovered within weeks, $300,961.22 retained; zero criminal-history points | Defense requests probation with 6 months' home detention |

Three observations discipline the comparison.

*First*, the direction of culpability. Gillespie did not merely participate in a bribery scheme; he *was* the scheme — the public official, the holder of the trust, the recurring party who serviced "a lot of different people" over seven years and cost the City five times what Mr. Erny's conduct did. The Guidelines themselves grade bribe-*taking* public officials above bribe-payers, *compare* U.S.S.G. § 2C1.1(a)(1) (base level 14 for public officials) *with* § 2C1.1(a)(2) (base level 12 for others); PSR ¶ 53, and the four-year sentence this Court imposed on Gillespie reflects that architecture. So does Sary's seven-year sentence, at the summit of an $18 million fraud practice with eighty-five PPP customers.

If the marketplace's proprietor drew 48 months and the fraud factory's owner drew 84, then a Guidelines term of 33 to 41 months for a single zero-point customer — within ten months of the proprietor's sentence — would compress the culpability ladder into near-flatness. That is the disparity § 3553(a)(6) forbids: not merely like defendants treated differently, but *unlike* defendants treated alike.

*Second*, the precedent within this very family of cases for home detention as real punishment. Sary's own sentence — imposed by this Court — includes twelve months of home detention as a component of supervised release. The sanction the defense requests is one this Court has already found meaningful enough to impose on the scheme's professional.

*Third*, the attached JSIN report closes the loop: for the ten cohort members who were incarcerated, the average custodial term was 26 months — roughly a fifth below the 33-month floor of Mr. Erny's range — and a further cohort member received no imprisonment at all, confirming that the range overstates the sentence this profile ordinarily draws. PSR at 27 (JSIN) — the very circumstance the Guidelines' zero-point departure note now addresses, see infra Part VI.D.

**D. The requested noncustodial sentence is authorized three times over — by the Government's substantial-assistance motion, the Guidelines' zero-point departure provision, and a § 3553(a) variance — and home detention is substantial punishment.**

The Court should begin where candor requires. Because the advisory range falls in Zone D, the Guidelines' default instruction is that "the minimum term shall be satisfied by a sentence of imprisonment," U.S.S.G. § 5C1.1(f), and home detention is ordinarily available as a substitute for imprisonment only in Zones B and C, *id.* § 5C1.1(c)–(e); § 5F1.2. The defense does not pretend otherwise. But that default is a starting point, not a wall — and three independent doors lead through it to the sentence Mr. Erny requests, one of them opened by the Government itself.

*The Government's own motion opens the first door.* The Government has moved, pursuant to U.S.S.G. § 5K1.1, for a two-level reduction in recognition of Mr. Erny's substantial assistance and cooperation. That motion carries the offense level to 18 and the advisory range to 27 to 33 months, and — of greater moment here — it vests the Court with authority to depart below the advisory range, the extent of that departure committed to the Court's judgment. U.S.S.G. § 5K1.1. A defendant's assistance to authorities is, moreover, a characteristic the Court weighs in its own right under § 3553(a)(1) and 18 U.S.C. § 3661. Counsel does not rehearse the substance of that assistance here; it is enough that the Government has formally recognized it, and that its recognition converges with the two grounds that follow to point toward the same noncustodial result.

*The Guidelines' own zero-point provision opens the second door.* As part of the same 2023 amendment that gave Mr. Erny his two-level zero-point reduction, the Commission added Application Note 10(B) to § 5C1.1, which provides that "[a] departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate" where a defendant "received an adjustment under § 4C1.1" and "the defendant's applicable guideline range overstates the gravity of the offense." U.S.S.G. § 5C1.1 cmt. n.10(B). Mr. Erny is the offender that note describes. He received the § 4C1.1 adjustment, PSR ¶ 71, and his range overstates the gravity of his offense for the reason developed in Part IV: fourteen of his combined offense levels rest on a $996,240 loss figure that overstates the realized harm by more than two-thirds, because the bank recovered $695,278.78 within weeks. Attach. A; PSR ¶¶ 36–37. The

Commission has thus written, into the Guidelines' own text, a departure to a noncustodial sentence for precisely this defendant.

*Section 3553(a) opens the third door, independently.* The Supreme Court affirmed a sentence of probation imposed from an advisory range of 30 to 37 months — squarely within Zone D — as a reasonable exercise of sentencing discretion. *Gall*, 552 U.S. at 41, 59–60. A district court's judgment that the § 3553(a) factors justify even a substantial variance is owed "due deference" on review. *United States v. Diosdado-Star*, 630 F.3d 359, 366–67 (4th Cir. 2011). Whether the Court proceeds on the Government's § 5K1.1 motion, by departure under Note 10(B), or by variance under § 3553(a), the destination is authorized and the same.

*And the sentence is one Congress expressly authorized — and one that punishes.* Bribery under § 666(a)(2) is a Class C felony for which Mr. Erny is probation-eligible by statute, 18 U.S.C. § 3561(c)(1); PSR ¶ 124, and home confinement is an authorized condition of probation that Congress designed "only as an alternative to incarceration," 18 U.S.C. § 3563(b)(19); see U.S.S.G. § 5F1.2. It is no dispensation. "Offenders on probation are . . . subject to several standard conditions that substantially restrict their liberty," and probation is "not granted out of a spirit of leniency . . . [it] is an authorized mode of mild and ambulatory punishment . . . intended as a reforming discipline." *Gall*, 552 U.S. at 48 & n.4 (citation omitted). The courts of appeals have applied that teaching to white-collar defendants whose profiles mirror Mr. Erny's.

In *United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) (en banc), the en banc Third Circuit affirmed probation with a year of home detention, community service, and a maximum fine for a construction-company owner who evaded $228,557 in taxes against an advisory range of 12 to 18 months — emphasizing that "whether detention in a particular home is appropriate punishment is precisely the type of fact-bound inquiry that a sentencing court is better suited to make." *Id.* at 573. And this Circuit's decision in *United States v. Pauley*, 511 F.3d 468, 474–75 (4th Cir. 2007), affirmed a substantial downward variance resting in part on consequences the Guidelines never count — the defendant's loss of his professional certificate and state pension, which the court found "consistent with § 3553(a)'s directive that the sentence reflect the need for 'just punishment.'"

Mr. Erny's parallel losses are concrete: a felony judgment against a man whose assisted-living operation depends on state licensure, PSR ¶ 110; a forfeiture judgment of $300,961.22, Plea Agreement ¶ 12; restitution approaching half a million dollars; and a marriage the Presentence Report describes as "strained due to the instant offense," PSR ¶ 91.

Candor requires one more paragraph. The stipulated messages in this record are ugly. "F the city" is not a sentiment counsel will dress up, and the defense does not ask the Court to avert its eyes from four years of corrupt payments or from the calculation visible in the PPP scheme's sham payroll. Attach. A. Mr. Erny pleaded guilty because he is guilty. But sentencing measures a man, not a text thread, and the measure of this man includes what he did when the schemes ended: complete acceptance, thirteen violation-free months on unsupervised release, voluntary monthly repayment, and a family and business infrastructure that make a community sentence enforceable rather than aspirational. Six months of home detention — enforced by location monitoring, verified by a Probation Office that has already inspected the residence, PSR ¶ 99 — is punishment a fifty-five-year-old businessman will feel every day, in the city where everyone knows his name and his conviction.

### E. The economics: § 3553(a)(7) and § 3572(a)(6) both point away from prison.

Congress made "the need to provide restitution to any victims of the offense" a sentencing factor in its own right. 18 U.S.C. § 3553(a)(7). In this case that factor is nearly dispositive, because the arithmetic is stark. *What liberty produces*: Mr. Erny's self-employment — the rental properties and the assisted-living facility — generates approximately $8,000 per month, PSR ¶¶ 111–12, supporting a documented household cash flow of $5,750 per month after expenses, PSR ¶ 117. That is the entire engine of restitution. It does not run from a federal facility: the properties do not manage themselves, and the assisted-living business does not survive its operator's imprisonment. *What prison costs*: by the Administrative Office's most recent advisory — reproduced in the Presentence Report itself — imprisonment costs $4,575 per month ($54,900 per year), while supervision by a probation officer costs $519 per month ($6,222 per year). PSR ¶ 129.

A low-end Guidelines sentence of 33 months would cost the public approximately $150,975, while simultaneously destroying the income stream that would otherwise pay the

victims approximately $448,445.51. The Court is directed to consider precisely these costs. 18 U.S.C. § 3572(a)(6); U.S.S.G. § 5E1.2(d)(7).



**The Cost of Custody vs. Supervision**

Figure 1. *Annual cost to the public of custody versus community supervision.*

A sentence of home detention and probation costs the taxpayers roughly four percent of what imprisonment costs, preserves the victims' only realistic source of repayment, and keeps a functioning assisted-living facility — and the vulnerable adults it houses — in operation. Imprisonment here would be punishment *of the victims*: the City would wait years longer for its money so that the taxpayers could spend $150,000 confining the man who owes it.

**F. Restitution should be ordered at the victims' actual loss — correctly measured, correctly directed, fully credited, coordinated with forfeiture, scheduled to ability to pay, and without interest.**

Mr. Erny agreed in his plea to entry of a restitution order in the stipulated amount of $448,445.51 — $300,961.22 as to the PPP loan and $147,484.29 to the City of Baltimore — and he does not resile from that agreement. Plea Agreement ¶ 20. The defense asks only that the order be *accurate* in six respects the statute itself commands — and that the figure the Court ultimately enters reflect the victims' actual loss, which is the measure the MVRA makes controlling.

*1. The measure is actual loss; the stipulation is a ceiling, not a command to overpay.* Restitution under the MVRA is compensatory, not punitive: it is limited to the victims' actual losses caused by the offense conduct, *Hughey v. United States*, 495 U.S. 411, 413, 416 (1990); 18 U.S.C. § 3663A(b)(1), and reaches only those "directly and proximately harmed as a result of the commission of" the offense, *United States v. Cohen*, 459 F.3d 490, 498 (4th Cir. 2006). Any

claim above the stipulated figure would be the Government's to prove by a preponderance, 18 U.S.C. § 3664(e); none has been made, and Probation recommends restitution in exactly the stipulated amount, PSR ¶ 130. The order should say $448,445.51 — a number, not a floor.

*2. The City of Baltimore's share must be limited to the obligations it was lawfully entitled to collect.* Restitution compensates a victim for what the offense actually cost it — no more. 18 U.S.C. § 3663A(b)(1); *Hughey*, 495 U.S. at 416. Where a defendant bribes an official to extinguish a municipal charge, the City's loss is the value of the *valid* obligation forgiven; that loss is not reduced by the fact that a bribe procured it, but neither is it inflated by amounts the City had no lawful right to collect in the first place. The stipulation fixes the City's loss at "at least" $147,484.29, Plea Agreement ¶ 20 — a figure the Court retains an independent duty to test as *actual* loss under § 3664(e). Mr. Erny represents, and the record independently suggests, that a material portion of the extinguished balances consisted of demonstrable billing errors — including estimated, duplicative, and non-consumption water charges he had formally disputed through legitimate channels as early as 2020, long before any bribe. *See supra* Part III.A & n.3.

To the extent those components were charges the City could never lawfully have collected, their cancellation caused the City no compensable loss, and the restitution figure should be reduced accordingly. The defense will present the supporting municipal billing records at or before the hearing[6] and respectfully requests that the Court determine the City's actual loss under § 3664(e). This is not a retreat from responsibility: Mr. Erny admits without reservation that he paid bribes to make his municipal obligations disappear, and he contests not a dollar of the offense conduct. He asks only that the sum he is ordered to repay reflect what the City actually lost.

*3. The payee: the entity that bears the loss today.* The stipulation names Cross River Bank as to $300,961.22. But Mr. Erny is presently billed $1,700 per month on an SBA repayment schedule for this very loan, which indicates the SBA may have honored its guarantee and purchased the loan — in which case the SBA, not Cross River, bears the loss, and § 3664(j)(1)

---

[6]Counsel is assembling the Baltimore City water and tax billing records for the affected properties, together with Mr. Erny's 2020 correspondence disputing the water charges, to quantify the erroneous components. The precise figure will be presented by supplement or at the hearing; the defense does not ask the Court to accept an unsupported number.

directs that restitution follow it. The defense respectfully requests that the Government confirm, before entry of judgment, which entity holds the loss, so that the order compensates the true obligee and Mr. Erny's payments retire a single debt rather than two parallel ones.

4. *The credits: every dollar already recovered or repaid.* The $300,961.22 figure already nets out the bank's $695,278.78 clawback, Attach. A — the stipulation is honest on that score — but the order must also credit (a) all payments Mr. Erny has made on the SBA schedule through the date of sentencing, and (b) any amounts he has paid the City of Baltimore since 2023 on obligations that compose the $147,484.29 loss figure. Restitution may not be ordered to make a victim more than whole; double recovery is forbidden. 18 U.S.C. § 3664(j)(2).

5. *Forfeiture–restitution coordination: the same $300,961.22 should not be collected twice.* The forfeiture money judgment, Plea Agreement ¶ 12, and the Cross River/SBA restitution figure are the same $300,961.22 — the same dollars, traced to the same loan. Forfeiture and restitution are formally independent, and the Court cannot offset one against the other *sua sponte* — but the Attorney General possesses express statutory authority to *restore* forfeited funds to victims, 18 U.S.C. § 981(e)(6), and the Department's restoration and remission process, 28 C.F.R. pt. 9, exists for precisely this situation. The defense respectfully requests that the Court's judgment note, and that the Government commit on the record to pursue, restoration of any forfeited amounts to the victims, so that every dollar collected under either instrument reduces the single true loss. Anything else converts a compensatory scheme into a $600,000 penalty Congress never enacted.

6. *Schedule and interest.* The MVRA requires full restitution without regard to economic circumstances, 18 U.S.C. § 3664(f)(1)(A), but it equally requires the Court to fix a payment schedule in light of the defendant's financial resources, projected earnings, and obligations, § 3664(f)(2) — and it authorizes waiver of interest where the defendant lacks the means to pay it, § 3612(f)(3)(A). On this record — $5,750 in monthly cash flow, PSR ¶ 117, against a $448,445.51 obligation, ongoing $1,700 monthly SBA payments, and two daughters in college, PSR ¶ 91 — the defense proposes an initial schedule of $_____ per month, subject to Probation's continuing review, with interest waived. A schedule the defendant can actually meet, enforced by the probation conditions Probation has already drafted (financial

disclosure, no new credit), will pay these victims faster than any sentence of imprisonment could.

Finally, no fine should be imposed. Probation recommends a fine of $0, PSR, Sentencing Recommendation, and the law prioritizes restitution over fines where resources are finite: the Court "shall impose a fine . . . only to the extent that such fine . . . will not impair the ability of the defendant to make restitution." 18 U.S.C. § 3572(b). Every dollar taken as a fine is a dollar taken from the City of Baltimore.

### G. The proposed sentence.

Mr. Erny respectfully requests that the Court impose: (1) a term of probation of one year, 18 U.S.C. § 3561(c)(1), with conditions including home detention for the first six months with location monitoring, 18 U.S.C. § 3563(b)(19); U.S.S.G. § 5F1.2, with leave to depart only for employment (including management of the rental properties and Saint Paul Assisted Living), medical and mental-health treatment, religious services, court appearances, and as Probation directs; restitution in the amount the Court determines to be the victims' actual loss under § 3664(e), directed, credited, scheduled, and without interest as set out in Part VI.F; mental-health and substance-abuse evaluation, treatment, and testing; full financial disclosure to Probation and no new lines of credit without approval; and community service as the Court deems appropriate; (2) the mandatory special assessment of $100, 18 U.S.C. § 3013; PSR ¶ 127; (3) no fine, consistent with Probation's recommendation and 18 U.S.C. § 3572(b); and (4) entry of the forfeiture money judgment per the plea agreement, with the restoration request noted in Part VI.F.5.

## VII.  CONCLUSION

Joseph Gillespie sold the powers of a public office for seven years, to "a lot of different people," and this Court measured that betrayal at four years. Ahmed Sary built an $18 million fraud practice and this Court measured it at seven. James Erny bought what those men sold. The sentence proposed here fits his place in that order: six months of home detention that this Court has already recognized, in Sary's own sentence, as meaningful punishment; supervision with teeth; and a restitution structure that pays the City of Baltimore and the taxpayers back out of the earnings of a man working under the Court's thumb rather than sitting at the public's expense.

A sentence of probation with home detention, on the conditions proposed, is sufficient. On this record, anything greater is greater than necessary — and it is the victims who would pay the difference.

Respectfully submitted,

_____/s/_____

Tony N. Garcia, Esq.
Garcia Law, PC
7 St. Paul Street, Suite 1100
Baltimore, Maryland 21202
(410) 814-4600
*Counsel for James Carroll Erny, Jr.*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 17th day of July, 2026, the foregoing Memorandum was filed via the Court's electronic filing system and thereby served upon all counsel of record for the United States.

_____/s/_____

Tony N. Garcia, Esq.